Julian F. BATES, Plaintiff,

v.

STATE OF WISCONSIN; Wisconsin Air National Guard; Jerald D. Slack, individually and in his official capacity as the Adjutant General of the State of Wisconsin; and Eugene A. Schmitz, individually and in his official capacity as the Commander, 128th Air Refueling Group, Wisconsin Air National Guard, General Mitchell Field, Defendants.

No. 93–C–0470.

United States District Court,
E.D. Wisconsin.

June 7, 1993.

Walter F. Kelly, Sutton & Kelly, Milwaukee, WI, for plaintiff.

Major Terence J. McArdle, Asst. Staff Judge Advocate, Headquarters, WI National Guard, WING–SJA, Madison, WI, Nadim Sa-

har, Asst. Atty. Gen., Milwaukee, WI, for defendants.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on Plaintiff's Motion for a Preliminary Injunction seeking to prevent his involuntary separation from active status in the Air Wisconsin Guard and the concurrent termination of his employment as a Guard technician. On March 12, 1993, Plaintiff, Colonel Julian F. Bates ("Colonel Bates"), received notice that his mandatory, involuntary separation would be effective May 18, 1993 due to his having thirty (30) years of military service and five (5) years in rank as Colonel. Oral argument on the motion was heard on May 17, 1993 and was denied by phone that same day indicating that a written decision would follow. Set forth below are the reasons for the Court's denial of Colonel Bates' Motion for a Preliminary Injunction.[1]

## BACKGROUND

Colonel Bates is a fifty-one (51) year old, thirty-one (31) year veteran with a distinguished record of service to the United States. Prior to his separation on May 18, 1993, Colonel Bates served as Deputy Commander—Maintenance of the 128th Refueling Group of the Wisconsin Air National Guard at General Mitchell Field. There is no evidence to rebut the comments of the former Commander of the 128th Air Refueling Group that "Colonel Bates [is] one of the most outstanding officers I ever commanded." (Stasiewicz Affidavit at ¶ 3) In fact, Colonel Bates was primarily responsible for the air refueling operations for the flying support for the nuclear deterrent force of the Strategic Air Command. *Id.* Notwithstand-

ing the above, resolution of this motion does not hinge upon the obvious competence and dedicated service of Colonel Bates. Rather, the analysis must rest upon the law as written by Congress and the discretion which Congress chose to vest in the Secretary of the Air Force and the Adjutants General of the National Guard.

Reserve Colonels, like Colonel Bates, who have served for thirty (30) years or five (5) years in the rank, whichever is later, **shall** be transferred to the Retired Reserve. *See* 10 U.S.C. § 8851(a)(1).[2] Pursuant to the National Guard Technicians Act of 1968, codified at 32 U.S.C. § 709 *et seq.*, a technician, employed in a position in which National Guard membership is required as a condition of employment and who is separated from National Guard membership ... **shall** be promptly separated from his technician employment. § 709(e)(1). Therefore, Colonel Bates' mandatory separation from active status in the Wisconsin Air National Guard has the immediate effect of terminating his technician employment. A purpose of the Technicians Act was to provide a stable and qualified group of National Guard technicians by giving them civil service protection. *DiLuigi v. Kafkalas,* 584 F.2d 22, 26 (3rd Cir.1978) *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979) ("[Congress intended] to put the technicians in the same position as civil service employees to the extent reasonably possible.") In order to qualify for an unreduced annuity under the Civil Service Retirement System, a technician must be employed at least until the age of 55. (Note 2, Table 1, ANGR 36–05, Kelly Aff., Exhibit A)

In apparent recognition of the potential inconsistencies between § 8851(a)(1)'s mandatory separation requirement and the intent and purposes of the civil service protections

---

1. At oral argument, Defendants Wisconsin Air National Guard and Adjutant General Jerald D. Slack (individually and in his official capacity) moved to dismiss the action based on the Court's lack of personal jurisdiction due to improper service of process. The Court orally denied these motions. The record contains the Court's reasoning.

2. 10 U.S.C. § 8851 provides in pertinent part:

(a) ... each officer in an active status in the reserve grade of colonel whose name is not on a recommended list for promotion to the reserve grade of brigadier general ... shall, 30 days after he completes 30 years of service ... or on the fifth anniversary of the date of his appointment in the grade in which he is serving, whichever is later—

(1) be transferred to the Retired Reserve, if he is qualified and applies therefor.

afforded by the Technicians Act, the Secretary of the Air Force may authorize retention in an active status until age 60 if the officer is employed as a technician under section 709 of Title 32. *See* 10 U.S.C. § 8851(c)(1)[3] In furtherance of § 8851(c)(1)'s purpose, the Department of the Air Force promulgated Air National Guard Regulation 36–05. ("ANGR 36–05"). (Administrative Separation/Discharge of Commissioned Officers and Warrant Officers of the Air National Guard of the United States, attached as Exhibit A to the Affidavit of Walter F. Kelly and filed in support of Plaintiff's Motion). ANGR 36–05, at Table 1, provides that the Adjutant General may approve or disapprove retention until age 55. On at least one prior occasion, Colonel Bates applied for, and did receive a waiver from the Adjutant General. (Deputy Adjutant General Wilkening's letter dated June 8, 1992, attached as Exhibit A to the Complaint) However, Colonel Bates' application of November 1, 1992 was rejected. Adjutant General Jerald D. Slack decided, after "careful consideration", that "a waiver will not be granted and you will retire not later than your mandatory separation date." (Adjutant General Slack's letter dated November 19, 1992, attached as Exhibit C to the Complaint) In a subsequent letter, Adjutant General Slack stated that he was "not persuaded" to change his decision. "The issue you raised concerning the number of officers that may request waivers in the future was discussed at the Air Commanders Call today. The unanimous decision was that each request would be examined at the time it is made." (Adjutant General Slack's letter of January 25, 1993, attached as Exhibit D to the Complaint) Attorney Walter F. Kelly wrote to Adjutant General Slack requesting reconsideration of the decision based on his conclusion that, notwithstanding other grounds, Colonel Bates' separation was prohibited by the National Defense Authorization Act of 1993. (Walter F. Kelly's letter of March 1, 1993, attached as Exhibit E to the Complaint) Adjutant General Slack wrote to

Attorney Kelly, disagreed with his interpretation of the National Defense Authorization Act, and reaffirmed his decision of November 19, 1992. (Adjutant General Slack's letter of March 12, 1993, attached as Exhibit F to the Complaint)

Colonel Bates filed his Complaint and Motion for a Preliminary Injunction/Temporary Restraining Order on May 11, 1993. Colonel Bates has advanced three (3) arguments in support of the motion. Colonel Bates argues that the Adjutant General's decision is: 1) prohibited by the National Defense Authorization Act of 1993; 2) in violation of 32 U.S.C. § 709 and ANGR 36–05; and 3) in violation of the due process clause of the Fifth Amendment as incorporated in the Fourteenth Amendment.

## LEGAL ANALYSIS

"Before a preliminary injunction will issue, the movant must show, as a threshold matter, that: 1) they have no adequate remedy at law; 2) they will suffer irreparable harm if the injunction is not granted; and 3) they have some likelihood of success on the merits in the sense that their 'chances are better than negligible'. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–87 (7th Cir.1984) (citations omitted) If the movant can meet this threshold burden, the inquiry then becomes a 'sliding scale' analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits." *National People's Action v. Wilmette*, 914 F.2d 1008, 1010 (7th Cir.1990), *cert. denied, Wilmette v. National People's Action*, —— U.S. ——, 111 S.Ct. 1311, 113 L.Ed.2d 245 (1991). Despite the Seventh Circuit's gradual lowering of the threshold, the Court concludes that Colonel Bates has not made the necessary showing to support the issuance of a preliminary injunction. Because the Court finds that Colonel Bates' chances of success on the merits are not better than

---

**3.** 10 U.S.C. § 8851(c) provides: Notwithstanding subsections (a) and (b), the Secretary of the Air Force may authorize the retention in an active status until age 60 of an officer who would otherwise be removed from an active status under this section who—

(1) is employed as a technician under section 709 of title 32 in a position for which membership in the National guard is required as a condition of employment.

negligible, it need not examine the other steps of the analysis.

## PART I

### THE NATIONAL DEFENSE AUTHORIZATION ACT OF 1993

■ Colonel Bates has argued to the Adjutant General and to this Court that the National Defense Authorization Act of 1993 ("NDAA") prohibits his separation from active status in the Wisconsin Air National Guard. (Complaint, Exhibit E) (The applicable provisions of the NDAA can be found at Pub.L. No. 102–484; U.S.Code Congressional & Administrative News, 102nd Congress–Second Session (1992) at 106 Stat. 2315. The pertinent sections of the plan are set forth at Pub.L. No. 102–484:

§ 4411 provides:

In this subtitle, the term "force reduction transition period" means the period beginning on October 1, 1991, and ending on September 30, 1995.

§ 4413 provides:

(a) **In General.** During the force reduction transition period, a member of the Selected Reserve may not be involuntarily discharged from a reserve component of the Armed Forces, or involuntarily transferred from the Selected Reserve, before the Secretary of Defense has prescribed and implemented regulations that govern the treatment of members of the Selected Reserve assigned to such units and members of the Selected Reserve that are being subjected to such actions and a copy of such regulations has been transmitted to the Committee on Armed Services of the Senate and House of Representatives.

§ 4414 provides:

(a) **Purpose of Plan.** The purpose of the regulations referred to in section 4413 shall be to ensure that the members of the Selected Reserve are treated with fairness, with respect for their service to their country, and with attention to the adverse personal consequences of Selected Reserve unit inactivations, involuntary discharges of such members from the reserve components of the Armed Forces, and involuntary transfers of such members from the Selected Reserve.

Colonel Bates argues that since his involuntary separation took place within the "force reduction transition period", the NDAA's provisions protect him and the Adjutant General's decision must be rescinded. As the Defendants asserted during oral argument, it is not certain that the NDAA is applicable to Colonel Bates' separation. Given the use of the language "force reduction" and "Selected Reserve Unit inactivations", it does not appear that the protections of NDAA were intended to cover mandatory separations under 10 U.S.C. 8851(a)(1). Further support for this conclusion is found in § 4415 of the NDAA:

INAPPLICABILITY TO CERTAIN DISCHARGES AND TRANSFERS.

**The protections, preferences, and benefits** provided for in regulations prescribed in accordance with this subtitle **do not apply** with respect **to a member of the Selected Reserve who is discharged** from a reserve component of the Armed Forces or is transferred from the Selected Reserve to another category of the Ready Reserve, to the Standby Reserve, or **to the Retired Reserve:**

(1) at the request of the member unless such request was made and approved under a provision of this subtitle or section 1331(a) of title 10, United States Code (as added by section 4417);

(2) **because the member no longer meets the qualifications for membership in the Selected Reserve set forth in any provision of law as in effect on the day before the enactment of this Act;**

(3) under adverse conditions, as characterized by the Secretary of the military department concerned;

(4) if the member:

(A) is immediately eligible for retired pay based on military service under any provision of law;

(B) **is serving as a military technician, as defined in section 8401(30) of title 5, United States Code, and would be immediately eligible for an unreduced**

annuity under the provisions of subchapter III of chapter 83 of such title, relating to the Civil Service Retirement and Disability System, or the provisions of chapter 84 of such title, relating to the Federal Employees' Retirement System; or

    (C) is eligible for separation pay under section 1174 of title 10, United States Code.

(emphasis added)

Pursuant to the NDAA, the Air National Guard Bureau has issued guidelines to assist in the compliance with its provisions. A copy of the Guidelines, entitled "Guidelines for Implementation of Transition Programs for Members of the Selected Reserve", was provided to the Court by Attorney Kelly who received them from the Air National Guard Bureau of the Department of Defense in Washington, D.C. (Kelly Affidavit at ¶ 3) Section 2, captioned, "Involuntary Separation Defined" implements § 4415. Pursuant to § 4415(2), subsection (a)(3) excludes from the protections of the NDAA, "[the member who was discharged or transferred] because the member did not meet the qualifications for membership in the Selected Reserve under law or regulations which were in effect on October 22, 1992". In addition, Pursuant to § 4415(4)(B), subsection (b)(2) excludes from the protections of the NDAA, "[the member who was discharged or transferred and is], "immediately eligible for an unreduced annuity under the Civil Service Retirement and Disability System if serving as a military technician in the Army National Guard, Army Reserve, Air National Guard, or Air Force Reserve.".

The plain language of the NDAA, and the Guidelines promulgated pursuant thereto, do not afford Colonel Bates any protection. The NDAA simply does not apply to a mandatory separation pursuant to 10 U.S.C. § 8851(a)(1). In short, § 4415(2) of the NDAA and Section 2(a)(3) of the Guidelines provide that the NDAA does not apply to a separation which is done pursuant to a law which was in effect before October 22, 1992. As enacted, 10 U.S.C. § 8851(a) provided for an effective date of June 30, 1960.[4] Therefore, the Adjutant General's decision does not violate the NDAA and the provisions thereof do not preclude Colonel Bates' mandatory, involuntary separation. To hold otherwise would require the Court to conclude, not only that Congress, sub silentio, repealed the mandatory separation provision of 10 U.S.C. § 8851(a)(1), but also that § 4415(2) does not mean what it says.

With respect to § 4415(4)(B) and Section 2(b)(2) of the Guidelines, Colonel Bates argues that because Congress specifically precluded from the protections of the NDAA those technicians who were immediately eligible for an unreduced annuity, "[c]learly Congress intended to allow technicians like Colonel Bates to enjoy the protections of §§ 4413 and 4414 and their implementing transition plan regulations where their annuities would be reduced by actions such as General Slack's of November 19, 1992." (Memorandum in Support of Motion for Preliminary Injunction at 13) This conclusion must be rejected in light of § 4415(2). Each subsection of § 4415 sets forth a "type" of separation (voluntary and involuntary) which is not precluded by the NDAA. To read § 4415(4)(B) of the NDAA as expansively as Colonel Bates suggests would require the Court to close its eyes to § 4415(2).

Based upon the foregoing analysis, the Court concludes that the protections of the National Defense Authorization Act of 1993 are not applicable to Colonel Bates' mandatory, involuntary separation under 10 U.S.C. § 8851(a)(1), and do not support some likelihood of success on the merits.

## PART II

### 32 U.S.C. § 709 and ANGR 36–05

■ Colonel Bates' second argument in support of the motion is that the Adjutant General must show "cause" for failing to grant a waiver. "In the ordinary course 'cause' is required for termination of National Guard membership; and an officer separated from the National Guard *must* (emphasis in

---

4. A 1985 amendment deleted the language, "After, June 30, 1960, except ..." to provide simply, "Except ...". Pub.L. No. 99–145, § 1303(a)(27)(B).

original) be separated from technician employment." "Under the regulatory program of the Air National Guard[,] officers who are also technicians are reviewed on an annual basis ..." "Colonel Bates has been subject to both the 'cause' provision of 32 U.S.C. § 709(e)(3) and the selective retention review process, and he has consistently been highly evaluated and selectively retained ..." (Memorandum at 2–3) " ... [T]he expectation of guard officers like Colonel Bates who were subject to removal only for cause and who were fully qualified to perform their jobs and were regularly selectively retained on the basis of annual selective reviews were held to have mutual objective expectations of continued service and employment for purposes of attaining unreduced retirement annuities." (Memorandum at 10–11) [5]

Colonel Bates' argument that his mandatory separation from his technician position under 32 U.S.C. § 709(e)(1) is limited by § 709(e)(3)'s "for cause" requirement has been specifically rejected by the Supreme Court. *Tennessee v. Dunlap,* 426 U.S. 312, 96 S.Ct. 2099, 48 L.Ed.2d 660 (1976). Respondent Dunlap was a Tennessee Air National Guard technician who was denied re-enlistment and, under § 709(e)(1), separated from his position as a civilian technician. The District Court dismissed the complaint on the ground that the denial of re-enlistment was a military action not subject to review by a civilian court.[6] In reversing, the Court of Appeals held that Dunlap "should be given an opportunity to prove that his denial of re-enlistment was based not on any military considerations, but on a desire to terminate his technician employment in such a way as to circumvent § 709(e)(3)'s requirement of 'cause', which would have been applicable if his technician employment had been terminated directly." *Dunlap,* 426 U.S. at 314–15, 96 S.Ct. at 2101. In reversing the Court of Appeals, the Supreme Court held:

There is nothing in the language or structure of § 709(e) ... to suggest that subsection (3)'s requirement of cause was intended to qualify subsection (1)'s mandate that termination of employment accompany separation from the Guard. Nor is there anything to suggest that subsection (3) was intended to have any bearing on whether one is separated from the Guard.

*Id.* at 316, 96 S.Ct. at 2101.

It is true that Colonel Bates "*has been* subject to the 'cause' provisions of § 709(e)(3)". (Memorandum at 2–3) He is not now. Under *Dunlap,* (e)(3)'s cause requirement may not be grafted onto (e)(1)'s mandatory—"shall be promptly separated"—language. A showing of cause under (e)(1) is unnecessary where, as here, the Adjutant General has no discretion.

Though Colonel Bates can not sustain an argument that (e)(1) presents an opportunity for discretion, he correctly argues that the Adjutant General *does* have discretion, as provided in 10 U.S.C. § 8851(c)(1) and ANGR 36–05, to negate an (e)(1) situation. 10 U.S.C. § 8851(c)(1) provides that the Secretary of the Air Force may authorize the retention in active status until age 60 of an officer who would otherwise be removed and who is a technician. *See* n. 3. Pursuant to § 8851(c)(1), the Secretary of the Air Force promulgated ANGR 36–05:

**Retention to Qualify for Retirement or Annuity**

Notes:

(2) A technician officer who would otherwise be mandatorily separated under para 13a(11), (Expiration of authorized period in excess status) or 13b(7), (Elimination for length of service) *may be retained* (emphasis added) for a sufficient period of time to enable the officer

---

5. In support of this statement, Colonel Bates cites two cases—*Bollen v. National Guard Bureau,* 449 F.Supp. 343 (W.D.Pa.1978) and *Suro v. Padilla,* 441 F.Supp. 14 (D.P.R.1976). Because these cases were principally offered in support of the "property interest" and "due process' portions of the motion, the Court will discuss them further in Part III.

6. While the Seventh Circuit has not formally adopted the Fifth Circuit test of justiciability as set forth in *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971), it has cited it favorably. *Ogden v. United States,* 758 F.2d 1168, 1180 n. 7 (7th Cir.1985). The parties have not had an opportunity to sufficiently brief this issue. For purposes of this motion, the Court accepts the justiciability of the Adjutant General's decision.

to qualify for an immediate Civil Service Retirement System Annuity without reduction (55 years and at least 20 years service) or a State retirement system annuity for those officers who elect to continue membership. . . . *Retention under this Rule is not automatic.* (emphasis added) The officer must apply through channels at least 6 months before the date he/she would otherwise be removed. *The State Adjutant General is authorized to approve or disapprove retention until age 55.* (emphasis added)

The Adjutant General, by granting a retention waiver, can keep Colonel Bates in active reserve status and overcome the mandatory provisions of (e)(1). Unfortunately for Colonel Bates, under the plain language of both § 8851(c)(1) and ANGR 36–05, Congress chose to confer unfettered discretion on the Secretary of the Air Force, and by implication, the Adjutants General. The Secretary of the Air Force *may* authorize the retention in active status. A technician officer *may* be retained for a sufficient period to qualify for an immediate Civil Service System Annuity. The State Adjutant General is authorized to *approve or disapprove* retention until age 55.

■ For whatever reason, Congress chose to leave the decision to waive § 8851(a)(1)'s mandatory separation requirement within the discretion of the Secretaries of the Armed Services and the Adjutants General. Whether the discretionary nature of § 8851(c)(1) and ANGR 36–05 is inconsistent with the "intention" of Congress in passing the Technicians Act of 1968, is not a question for this Court to answer.[7] Where Congress has expressly declined to limit discretion, the Court can not undertake to do so. Accord-

ingly, the Adjutant General's decision not to approve the retention of Colonel Bates did not violate either 32 U.S.C. § 709 or ANGR 36–05. Some likelihood of success on the merits, therefore, has not been shown.

## PART III

### THE DUE PROCESS CLAIM

■ As a final argument, Colonel Bates asserts that his non-retention, "without any statement of individuated reason(s)", was "a bald denial of Fifth and Fourteenth Amendment fair hearing requirements." (Memorandum at 10) Colonel Bates' argument rests on the belief that the "custom and usage of retention waivers for the purposes of completing service to age 55" created a protectable property interest. (Memorandum at 11) The Adjutant General's decision was not only a violation with respect to "fair process, *Loudermill, supra,* but also to the extent of requiring non-arbitrary, non-capricious bases for the deprivation of continued service and employment, (citations omitted) bases wholly lacking in this case." (Memorandum at 11) Colonel Bates has therefore raised both "procedural" and "substantive" due process challenges to the Adjutant General's decision. Property interests are "created and their dimensions are defined by existing rules and understandings that stem from an independent source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Here, Colonel Bates is attempting to locate the source of his property interest in the custom and practice of the Wisconsin Air National Guard. In support thereof, Colonel Bates has submitted the affidavits of numerous officers who aver that it has been standard practice to grant the waiver.[8] Consider the following state-

---

7. At least one other Court has examined this issue and found no inconsistency. *Lear v. Schlesinger,* 1978 WL 83 (W.D.Mo.), 17 Fair Empl. Prac.Cas. (BNA) 337, 17 Empl.Prac.Dec. (CCH) P8472. "Keeping in mind that the statutory language is 'the best expositor of itself,' *Pennington v. Coxe,* 2 Cranch 33, 52, 6 U.S. 33, 37, 2 L.Ed. 199, 200 (1804) and that 'legislative intention, without more, is not legislation.' *Train v. City of New York,* 420 U.S. 35, 45, 95 S.Ct. 839 [845], 43 L.Ed.2d 1, 8 (1975), particular emphasis must be given the permissive language utilized in the statute itself." *Id.* at *10.

8. Melvin H. Cywinski, "[I]t was policy for these officers to receive a waiver from the State to continue with their technician job until they would reach minimum time and age for retirement required by civil service regulations."; Gene A. Feller, "I was told that it is the intention of this unit that as long as we were performing at an acceptable level, this would not be a problem and the unit would take care of us."; Robert G. Harshaw, "[T]hey all assured me that my goal of remaining with the 128th until age 55 was definite . . ."; James P Longtine, "He told me it was

ment of Kenneth G. Stasiewicz, the former Commander of the 128th Air Refueling Group:

> Furthermore, to the extent that it was permissible pursuant to statute and regulation, we would in the ordinary course extend technicians' service and related employment even beyond age 55 up to age 60 in order to carry out the purposes of the 1968 Act to ensure the air defense of the finest technician services. I too was extended by way of a retention waiver, as were several other officers with whom I served.

Stasiewicz Aff. at ¶ 5.

Based on the above, Colonel Bates argues that a property interest in continued retention has been created by a "mutuality of expectation" which strengthens the applicability of *Suro* and *Bollen.*[9] (Memorandum at 11)

Initially, the Court would note that, "[t]here is . . . a wealth of law which supports the proposition that a *reservist* does not have a property interest in continued employment." (emphasis in original) *May v. Gray*, 708 F.Supp. 716, 720 (E.D.N.C.1988) (citing *Sims v. Fox*, 505 F.2d 857, 861 (5th Cir.1974), *en banc, cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975) (additional cita-

tions omitted). The above cases acknowledge that Congress expressly intended reservists to serve at the pleasure of the Secretary concerned. Nevertheless, Colonel Bates, like the plaintiff in *Sims, supra*, argues that an implied promise or understanding has given rise to a property interest which is more than a "mere expectancy". *Id.* at 861.[10]

While Colonel Bates has set forth evidence that was absent in *Sims*, an examination of the cases cited by Colonel Bates leads the Court to conclude that there is no property interest. In *Suro*, the Chief of the Selective Service Section of the Puerto Rico National Guard sought a preliminary and permanent injunction preventing his separation from the Guard until he reached age 60. He challenged his separation on the grounds that the Army Retention Board, which was convened for the purpose of considering Suro's retention, was composed in violation of National Guard Regulation No. 635–102. *Id.* at 16–17. Like Colonel Bates, Suro argued that he had a property interest in continued retention entitling him to "the basic elements of due process". *Id.* at 18. Without discussion of this issue, the District Court stated, "We conclude that a likelihood to succeed has

common practice for Air Techs to be 'waived' until they earned a full annuity."; John E. Wozny; "It is a 'common belief' within the air technician force here at Milwaukee that when you are hired by this unit, there is an 'implied contract' that, barring misconduct or failure to perform you military duty, you will be retained until 55 ...".. "If this implied contract is now being changed, new hires must be made aware that this 'reality' no longer exists. I for one would have never accepted a full-time federal civil service position in the Wisconsin Air National Guard if such a condition of employment existed."

9. *Suro v. Padilla*, 441 F.Supp. 14 (D.P.R.1976); *Bollen v. National Guard Bureau*, 449 F.Supp. 343 (W.D.Pa.1978).

10. In *Sims*, a Reserve Air Force officer was honorably discharged after pleading nolo contendere to a charge of indecent exposure. In declining to find a property interest in continued employment, the Fifth Circuit stated, "In this case, Sims says he has a property right to continued employment, but he can point to nothing other than his own expectancy for the creation of that right. No statute created it; indeed, the statute express-

ly denied its existence. (referring to 10 U.S.C. § 1162) Neither has Sims pointed to any governmental regulation that might have led him to believe he had such a right. An Air Force regulation contract or regulation cannot grant that which Congress has specifically withheld." *Id.* at 862. *Sims* was a discharge case under 10 U.S.C. § 1162, not a mandatory separation case under 10 U.S.C. § 8851(a). Section 1162 provides that, "reserve commissioned officers may be discharged at the pleasure of the President." Upon inspection, a § 8851(c) separation offers a Reserve officer even less protection than does a § 1162 discharge. Section 8851(c) requires mandatory separation—not permitting, as does § 1162, the exercise of *any* discretion. Colonel Bates has argued that discretion under § 8851 is found in subsection (c) which permits periodic retention in active status. But to argue, as Colonel Bates must, that subsection (c) creates a protectable property interest, the Court would have to conclude that Congress's conferral of discretion in subsection (c), becomes instead a limitation on subsection (a). If, under *Sims*, there is no property interest implicated in a § 1162 case because reserve officers serve at the pleasure of the president, there can be no property interest implicated in a § 8851 case, despite subsection (c), where separation is mandatory.

been shown by plaintiff herein." *Id.* While the District Court in *Suro* granted the preliminary injunction, it did so without an analysis of the property interest at issue. Upon this Court's examination, Suro's property interest was different in nature than Colonel Bates'. In March of 1970, the National Guard Bureau granted to Suro a retention on his position to age sixty (60), that is, until March 1983. *Id.* at 15, n. 1. In 1976, an allegedly improperly constituted Board decided not to retain Suro. Significantly, neither Colonel Bates, nor any of the other officers, have been granted a complete, long-term right of retention. ANGR 36–06 provides for annual, discretionary review by the Adjutant General. Unlike Colonel Bates, Suro had more than a mere understanding that he would be retained, the request for retention had already been granted. In addition, Colonel Bates has not alleged failure to comply with a written regulation or procedure in deciding not to retain him, but only that the decision violates an unwritten custom and practice of the Air Wisconsin National Guard.

In *Bollen,* a colonel in the Pennsylvania Air National Guard challenged his separation claiming that "certain actions taken by the Secretary of the Air Force and the Adjutant General of Pennsylvania conferred on him a property right in his military employment until age sixty (60) so long as he remained otherwise qualified." *Id.* at 344–45. While the legal issue in *Bollen* is almost identical, the factual distinctions are significant.

The procedural and factual posture of *Bollen* is complex. For purposes of this Decision and Order, only the following is relevant: Prior to 1972, it was presumed that the so called "Grandfather Clause" (*see* 10 U.S.C. § 8846) conveyed a property interest in a reserve colonel's military employment.[11] On October 13, 1972, the office of the Judge Advocate General, United States Air Force, issued an opinion interpreting the Grandfather Clause and concluded that only majors and below were protected by the Grandfather Clause. *Bollen* at 346. Because of this new interpretation, the Secretary of the Air

Force delegated, pursuant to § 8851(c), the discretionary authority to retain reserve colonels until age 60. Because of the possibility that colonels had relied on the prior interpretation, the Secretary recommended retention where the officer was properly performing his technician job. *Id.* Pursuant thereto, the Chief of the National Guard Bureau prepared a list of individuals, including plaintiff Bollen, who should be retained until age 60. On May 9, 1973, Pennsylvania Adjutant General Henry J. Mier concurred in the decision to retain Bollen to age 60. In his letter authorizing retention, the Chief of the National Guard stated:

> In order to clearly establish their [air technician officers employed prior to July 1, 1955] status, the National Guard Bureau proposes to forward a *one time list* to the Air Reserve Personnel Center with instructions that the personnel are authorized to be retained to age 60 provided the officer is fully qualified to hold his military position and *properly performing* his technician duties. (emphasis added)

*Id.* at 350.

In 1975, the Chief Legal Advisor for the National Guard Bureau determined that technician colonels "do not have a mandated retention until age 60 because the Secretary of the Air Force can rescind or amend what he has promulgated." *Id.* at 347–48. Accordingly, Bollen, along with other officers, would be reviewed for retention annually. When he was denied retention in 1976, Bollen filed suit. In granting a permanent injunction against Bollen's separation until age 60, the District Court, relying on *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) concluded, "Plaintiff, however, does have a property interest in continued military employment conferred on him on May 9, 1973 by the Adjutant General of Pennsylvania pursuant to the authority delegated to the Chief, National Guard Bureau on January 24, 1973 under 10 U.S.C. § 8851(c)." *Id.* at 349–50. In addition, the District Court concluded that the decision

---

11. The National Guard Bureau had interpreted § 8846 to mean that Guard Technician Colonels

were excepted from § 8851(a)(1)'s mandatory separation.

not to retain Bollen was taken "to punish plaintiff for the exercise of his first amendment rights." *Id.* at 350.

Unlike Colonel Bates, both Suro and Bollen were subject to a deprivation of a property interest in continued retention after it had been conferred upon them by a clear exercise of discretion pursuant to § 8851(c). In Suro's case, the deprivation occurred six (6) years later; In Bollen's case, three (3) years later. Both Suro and Bollen had *formal, written grants* of retention, followed by a subsequent rescission. In comparison, Colonel Bates' interest is in the nature of an unwritten, informal understanding that, in the future, periodic waivers would be granted. Without discussing the issue of whether an Adjutant General may bind his successor Adjutants General, and despite the evidence that it was "common practice" or "generally understood", there has been no evidence presented that a prior Adjutant General, or someone acting pursuant to his direction, extended such a promise to Colonel Bates.[12] In addition, at least with respect to Bollen, the continued retention was predicated upon his "properly performing his technician duties" such that he had a reasonable expectation of a hearing to explore the "cause" of his non-retention. *Bollen* at 350. Colonel Bates, as discussed in Section II, is not protected by a "for cause" limitation on the Adjutant General's discretion.[13] Based upon the factual differences, Colonel Bates does not have, as did Suro and Bollen, a "legitimate claim of entitlement to it [continued retention]." *Roth,* 408 U.S. at 577, 92 S.Ct.

at 2709; *Sindermann,* 408 U.S. at 601, 92 S.Ct. at 2699–2700.

Colonel Bates also relies upon the Supreme Court's decision in *Sindermann* that a "system of custom and usage of durational retention based on annual performance review and assurances of continuation constituted *de-facto* tenure requiring due process safeguards." (Memorandum at 11) As with *Suro* and *Bollen,* the facts of *Sindermann* are clearly distinguishable from this case. In *Sindermann,* a non-tenured, college professor asserted that the decision not to rehire him was done in retaliation for the exercise of First Amendment rights, thereby entitling him to "procedural due process" to learn the reasons for that decision. The Odessa College teachers manual provided:

Teacher Tenure: Odessa College has no tenure system. The Administration of the College wishes the faculty member to feel that *he has permanent tenure as long as his teaching services are satisfactory* and as long as he displays a cooperative attitude toward his co-workers and his superiors, and is happy in his work. (emphasis added)

*Sindermann* at 600, 92 S.Ct. at 2699.

In addition to the above, guidelines were promulgated by the Coordinating Board of the Texas College and University System which provided that a person "employed as a teacher in the state college and university system for seven years or more had some form of job tenure." *Id.* An immediate distinction between *Sindermann* and this

---

12. Stasiewicz Aff. at ¶ 9, "[I]t was standard operating procedure ... to continue guard service.... by the regular pro-forma grant of requested retention waivers."; Bates' Aff. at ¶ 7, "It has been my custom and usage as well as that of other recruiting and interview officers that I have observed, to represent that retention until 55 ... is regularly advised and that applicants rely upon such advise"; Cywinski Aff., "They [Col. Frederick R. Wylie and Lt. Col. Paul Wright] told me that it was policy ..."; Feller Aff., "I am uncertain of who [either Greg Barrett or Lt. Col. Jean Price] went into the Details."; Harshaw Aff., "I couldn't say which full timer I specifically asked ..."; Longtine Aff., "He [Colonel Bates] told me that it was common practice for Air Techs to be 'waived' ..."; Wozny Aff., "This is what I was told by my supervisor, Kenneth G. Stasiewicz ...".

13. At page 6 of his Memorandum and during oral argument, Colonel Bates interprets the Adjutant General's letter of January 25, 1993, wherein he stated that "each request would be examined at the time it is made", as conferring a right to a hearing to explore the "individuating" reasons for each decision. While the language suggests that reasons for each decision may vary, it does not follow that a statement of those reasons, and a hearing to challenge them, is thereby created. A more accurate interpretation is that the Adjutant General intends to exercise his discretion fully and decide each request on a case by case basis—as permitted under § 8851(c) and ANGR 36–05. The Court can not conclude that a right to a hearing has been thereby created.

case is the existence of a formal, written policy which created an expectation that a teacher would be rehired unless his teaching services were not satisfactory. Unlike Colonel Bates, the petitioner in *Sindermann* also alleged that the decision not to rehire him was done as punishment for the exercise of his First Amendment rights. While these factual differences alone remove Colonel Bates' situation from *Sindermann*, it is significant that the respondent teacher was entitled to no more than a hearing:

> In this case, the respondent has alleged the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause'. [T]he respondent must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of 'policies and practices of the institution'. (citations omitted) *Proof of such a property interest would not, of course, entitle him to reinstatement.* (emphasis added) But such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency.

*Id.* at 602–3, 92 S.Ct. at 2700.

Even if the expectation of retention rises to the level of a property interest because of the "custom and practice" of the Wisconsin Air National Guard, it is of a much weaker character than that in *Sindermann*. Not only is the custom unwritten, but it is not limited, as discussed above, by a required showing of "cause". Where the Adjutant General's discretion is not limited, a hearing would be essentially meaningless. Upon examination of *Suro, Bollen,* and *Sindermann,* the Court concludes that Colonel Bates was not entitled to procedural due process protections.

██ Colonel Bates' final argument is that this property interest is not only protected

with respect to "fair process", but that the Adjutant General must show the decision was not arbitrary or capricious. (Memorandum at 11) This may be characterized as a "substantive due process" claim.[14] The concept of substantive due process rests on the principle that an individual may not be deprived of certain rights even if he receives all the "process" which is due if the reasons therefore are irrational. In this case, Colonel Bates argues that the Adjutant General must demonstrate a good reason for his decision not to grant the waiver. This argument is based on both Colonel Bates and (former Commander) Kenneth Stasiewicz's conclusion that the decision was made because of a personality clash between Colonel Bates and current Commander Eugene A. Schmitz. (Memorandum at 5; Bates Aff. at ¶ 6; Stasiewicz Aff. at ¶ 9) Former Commander Stasiewicz avers that during his tenure, he supervised both Colonel Bates and Colonel Schmitz and that it was his recommendation that Colonel Bates succeed him as Commander of the 128th. However, General Harned, then Deputy Adjutant General, chose to elevate Colonel Schmitz. (Stasiewicz Aff. at ¶ 7) In what is described as an "extremely unusual" step, Colonel Schmitz forwarded Colonel Bates' request for retention without recommendation. (Memorandum at 5–6; Complaint, Exh. B) Colonel Bates has cited two cases in support of this argument: *Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 91–92, 98 S.Ct. 948, 955–56, 55 L.Ed.2d 124 (1978) and *Jeffries v. Turkey Run Consol. School Dist.,* 492 F.2d 1, 3–4 (7th Cir.1974). *Horowitz* is simply irrelevant, and the Seventh Circuit's opinion in *Jeffries* offers no support:

> '[S]ubstantive due process' means, as we understand the concept, that state action which deprives him of life, liberty, or property must have a rational basis—that is to say, the reason for the deprivation may not

14. In a substantive due process analysis, the Court must proceed carefully. "Substantive due process has at times been a treacherous field for this Court. There *are* risks when the judicial branch gives enhanced protection to certain substantive liberties without the guidance of the more specific provision of the Bill of Rights. As the history of the *Lochner* era demonstrates,

there is reason for concern lest the only limits to such judicial intervention become the predilections of those who happen at the time to be Members of this Court. That history counsels caution and restraint." *Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977).

644

be so inadequate that the judiciary will characterize it as 'arbitrary'. ... Certainly, the constitutional right to 'substantive' due process is no greater than the right to procedural due process. Accordingly, the absence of any claim by the plaintiff that an interest in liberty or property has been impaired is a fatal defect in her substantive due process argument.

*Id.* at 4.

Although Colonel Bates has claimed that a property interest was impaired, in light of this Court's conclusion that no property interest is present, his substantive due process claim fails. *See also, Polenz v. Parrott,* 883 F.2d 551, 558 (7th Cir.1989) citing *Kauth v. Hartford Insurance Co.,* 852 F.2d 951, 958 (7th Cir.1988) ("In cases where the plaintiff complains that he has been unreasonably deprived of a state-created property interest, without alleging a violation of some other substantive constitutional right or that available state remedies are inadequate, the plaintiff has not stated a substantive due process claim.") Even without the explicit holdings of *Jeffries* and *Polenz,* to examine the "arbitrariness" or "capriciousness" of the Adjutant General's decision, the Court would have to examine personnel relationships among officers in the Wisconsin Air National Guard. The courts are not equipped to do so. As the Supreme Court indicated in *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953):

> We know from top to bottom of the Army the complaint is often made, and sometimes with justification, that there is discrimination, favoritism, or other objectionable handling of men. But Judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates.

*Id.* at 93–94, 73 S.Ct. at 540.

Colonel Bates has failed to show that he has some likelihood of success on the merits and the motion must be denied.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

Plaintiff, Colonel Julian F. Bates' Motion for the Issuance of a Preliminary Injunction is **DENIED.**

**SO ORDERED.**